## DECLARATION OF WILLIAM GLOVER

I, William Glover, declare, under penalty of perjury, that:

1. I am over 18 years of age and competent to provide testimony before any Court or tribunal.

2. At all times relevant hereto, I have resided, as a tenant, at the property known as 809-811 Otis Place N.W. (the "Property").

### The Tenant Association

3. The 809-811 Otis Place N.W. Tenants Association, Inc (the "TA") was formed on March 29, 2004 by myself and others pursuant to the laws of the District of Columbia. Attached as Exs. 1 and 2 are true copies of the Articles of Incorporation and Bylaws of the TA.

4. The initial directors of the TA were myself, as President, Augusto Moreno as Vice President, and Julia Ortiz as Secretary/Treasurer.

5. Subsequently, in April or May, 2004, Julia Ortiz vacated the Property and resigned her position. Pursuant to Article V Sec.4 of the Bylaws, Augusto Moreno and I agreed to appoint James Williams to fill her position.

6. Immediately thereafter, at each and every meeting of the Board and the TA, James Williams was in attendance and was held out to be a member of the Board. Neither Augusto Moreno nor any other tenant ever objected to Mr. Williams' status as a Board member, and no special election was ever demanded by any person to elect a different person to fill that seat.

7. From March, 2004 through March, 2005, I attempted to schedule several TA meetings. At no time did more than a few tenants attend. At no time did any tenant, including any Board member, request that an election be held. Accordingly, pursuant to Article V Sec.3 of the Bylaws Mr. Moreno, Mr. Williams and I continued to serve as the TA's directors, with me as the President and CEO.

8. In May, 2005, Augusto Moreno decided, on his own, to schedule a meeting of the TA for May 29, 2005. A copy of the notice for that meeting is attached as Ex.3. Even a cursory review of the notice for that meeting indicates that it was not in compliance with the Bylaws, as it did not state the purpose of the meeting (Article IV Sec4), and did not provide me or Mr. Williams with any notice that Mr. Moreno intended to call for our removal as directors and officers (Article V Sec. 5). Moreover, it was not noticed as an Annual Meeting to elect new directors (Article IV Sec1). **Accordingly, Augusto Moreno was not elected President at that meeting, and James Williams and I were not removed from the Board. To this date, Augusto Moreno has never been the President of the TA.**

9. On July 12, 2005, I requested a meeting with Mr. Moreno and his purported "legal" Board. Ex. 4. That request was denied on July 14. Ex. 5. Nevertheless, at that time, I made a decision to not actively challenge Mr. Moreno's attempted coup. There were several reasons for this decision. First, as a layperson, I was not completely aware of the multiple legal deficiencies in the purported election process. Second, I had other matters to attend to in my personal and professional life. Finally, I felt that if Mr. Moreno wanted to attempt to move the business of

the TA forward, I would give him the chance to do so. However, I never relinquished my position as an officer and director, and never formally delegated any powers to Mr. Moreno.

10. As time went on, I noted a lack of progress, and I became increasingly concerned that Mr. Moreno was not protecting the interests of the TA members. I discussed that with James Williams, and we determined that either as 2 directors, or as 10% of the membership of the TA, we were entitled to call a meeting of the general membership of the TA. We prepared a notice of a meeting for October 6, 2005. A copy of the notice for that meeting is attached as Ex. 6. The notice was properly and timely posted, and included the place, time, and purpose of the meeting. At that meeting, a quorum was present, and new officers and directors were elected. Mr. Moreno chose not to attend the meeting. By virtue of a unanimous vote, I was reelected President. A copy of the minutes from that meeting are attached as Ex. 7. Additionally, the meeting was recorded on audio and video, and a copy of the DVD is available for viewing.

11. On November 8th, 2005, Mr. Moreno, again without the consent of the lawful Board, scheduled another meeting, despite the fact that I told him that I could not attend. No notice was given concerning the purpose of that meeting. While I was not in attendance, I have been told by those present that no election was held and that, generally, Mr. Moreno was met with hostility from the members of the TA.

12. Subsequent to that meeting, and despite the fact that he was never elected President of the TA, Mr. Moreno continued to unlawfully hold himself out as President, and make demands of our legal counsel, Eric M. Rome, and others. I

instructed Mr. Rome not to comply with Mr. Moreno's demands. After one of those demands, Mr. Rome, on November 20th, told me, Mr. Moreno, and Mr. Moreno's purported counsel, B. Marian Chou, that it was his opinion that the May 29 meeting was not lawful (for the reasons previously stated), and that the October 6th meeting, while properly noticed, was not designated as an "Annual Meeting" and therefore not sufficient to elect directors. Therefore, according to Mr. Rome, the lawful directors remained me, Mr. Williams, and Mr. Moreno. Mr. Rome urged us all to schedule a proper annual meeting for the month of December, as contemplated by the Bylaws, to settle the issue once and for all. Ex. 8.

13. The fact that I questioned Mr. Rome's opinion concerning the October 6th meeting notwithstanding (I believe it had all of the necessary attributes of an Annual Meeting), I decided to follow his advice, and schedule an Annual Meeting to, inter alia, hold elections.

14. Mr. Moreno wrote a letter/email dated December 19, 2005, requesting a copy of Mr. Rome's retainer agreement, referencing his capacity as Vice-President. Ex. 9. Mr. Rome's immediate response, wherein he provided a copy of that agreement, is attached as Ex. 10. **Mr. Moreno's statement that Mr. Rome refused to provide that document is therefore an absolute falsehood. Equally important, at no time did Mr. Moreno ever ask me, as the custodian of the TA's records, for a copy of that retainer, or any other TA document.**

15. Following that exchange, Mr. Moreno, again without proper notice, scheduled a meeting at a local police station for December 19. I attended that meeting. Again,

no election was held. In fact, no election could be held, as there was no proper notice, no quorum, etc. Instead, the meeting consisted mostly of an attack on me and on Mr. Rome, the TA's legal counsel, by Mr. Moreno's attorney, Ms. Chou. While the substance of Ms. Chou's and Mr. Moreno's complaints were unclear, it was made clear that they intended to attempt to file a lawsuit to further their efforts to extort money.

16. At my behest, a lawful Annual Meeting of the TA was scheduled and held on December 22. At that meeting, a quorum was present, and new directors were elected. I was again elected President. Mr. Moreno was not reelected as a director. Additionally, at that meeting, those present signed a petition, indicating the results of the election, and affirmatively directing Mr. Moreno and Ms. Chou to cease representing themselves as representatives of the TA. Copies of the notice for that meeting, and the petition, are attached as Exs. 11 and 12.

17. **Accordingly, as detailed in the foregoing paragraphs, not only has Mr. Moreno never been the President of the TA, but he is no longer on the Board of Directors, and has no authority to speak for the TA.**

18. On December 23, at my direction, Mr. Rome informed Mr. Moreno and Ms. Chou of the results of the Annual Meeting, and offered them the opportunity to meet to discuss their grievances. In fact, I had made a similar offer earlier. Exs. 12 and 13. Instead of responding to those overtures, Mr. Moreno and Ms. Chou filed a mostly unintelligible lawsuit, falsely representing that Mr. Moreno was filing the lawsuit on behalf of the TA (Ms Chou could not even get the name of the TA

right). Ex. 13. The lawsuit was signed by both Ms. Chou and Mr. Moreno. It was filed in US District Court under the jurisdictional guise of a RICO suit.

19. In an interview with the DC Examiner newspaper on January 5th, 2006, Ms. Chou admitted that the lawsuit was a ploy to extort more money from various persons, and, equally important, admitted that she filed it without any idea how to prove her case. Ex.14. I understand that filing a lawsuit without proper foundation, as a ploy, and falsely representing the identity of your client may constitute unethical behavior.

20. A copy of the immediate response to the lawsuit is attached as Ex.15.

**The Association's Legal Counsel**

21. After the Association was formed in March, 2004, the Board of Directors interviewed several attorneys, one of which was Eric. M. Rome of Eisen & Rome, P.C. Mr. Rome came highly recommended from several sources.

22. At the interview, we discussed the issue of fees, and Mr. Rome explained that he had successfully represented many tenant associations in their purchase efforts over the years, and had learned that it was unrealistic to expect a tenant association to pay fees on a monthly basis based on hourly billing. Instead, Mr. Rome explained that he would charge a rate of $185/hr. and a retainer fee of $1000 (a nominal amount to demonstrate some tenant commitment) and that the balance of fees would be part of the negotiations with an ultimate developer, and due at closing on the Property. Mr. Rome immediately prepared a retainer agreement to that effect, a copy of which is attached hereto as Ex. 16. I executed that agreement with the approval of the Board of Directors on June 9th, 2004.

CK  
Le Hew

6

23. After the execution of that agreement, I communicated with Mr. Rome about a variety of issues. Mr. Rome identified potential development partners, secured an earnest money deposit of $50,000, discussed tenant problems with the owner's attorney, advised me on rent control issues, drafted the purchase contract, reviewed and provided feedback on proposals to both me and to developers, edited agreements, attended meetings of the Board and of the TA, authored memoranda, etc. At no time was I, or the Board, ever dissatisfied with Mr. Rome's representation. At no time did any member ever voice any dissatisfaction either.

24. From the inception of Mr. Rome's representation of the TA, to the present, I have always understood that Mr. Rome, like any attorney, would provide advice and guidance, but that the ultimate decisions were made by the Board. That model has been followed throughout, and all decisions concerning contracts with Mr. Rome or anyone else have been approved by a majority of the Board of Directors, pursuant to the Bylaws.

25. In March, 2005, the majority of the Board of Directors made a determination to enter into an agreement with Gallatin Company, now know as Lakritz Adler, which in turn formed an entity known as Otis Place LLC to purchase the Property (collectively, the "developer"). I informed Mr. Rome of that decision, and instructed him to finalize the negotiations on behalf of the TA. Mr. Rome undertook to do just that, and aggressively pursued the interests of the TA in the face of looming deadlines.

JAN-10-2006 TUE 03:26 PM ALLIED HOME MORTGAGE    FAX NO. 3014908860    P. 07

26. At that time, I discussed the issue of attorneys fees with Mr. Rome. In light of the fact that the agreement contemplated a second round of negotiations, post-closing, Mr. Rome indicated that he could not be dependent on the developer to approve his fees on an ongoing basis and still provide independent advice, and instead would accept a flat fee for completing any necessary work on the TA's behalf. We agreed that $20,000 would be a fair estimate. **I negotiated that fee with the developer, and it was approved by the Board, as indicated by my signature on Ex. 17. It was paid to Mr. Rome at closing with my express approval.**

27. Unfortunately, what seemed fair at the time to Mr. Rome now seems grossly unfair due to the derailment of this process by Mr. Moreno and Ms. Chou, and their scurrilous and unfounded attacks. I know from my personal knowledge that Mr. Rome, at this point, will be compensated at a far lower rate than the $185/hr contemplated due the volume of unnecessary work generated by these individuals. Nevertheless, Mr. Rome has confirmed my understanding that in no event will any further fees be owed by the TA.

28. At all times, Mr. Rome has been diligent, zealous, and responsive in his representation of the TA. At no point has there ever been any confusion or disagreement concerning his fees.

29. One further point bears mention. I have personally witnessed Ms. Chou telling Mr. Moreno and other tenants that Mr. Rome has stolen monies from other tenant associations, and that he is being prosecuted by the Office of Bar Counsel and Judge Rankin. While I understand from Mr. Rome that Ms. Chou has instigated complaints against him in various forums in an attempt to extort money in a

different case, I understand that none of have been sustained, and that Ms. Chou has misrepresented these situations. It is her misrepresentations which have been used to manipulate Mr. Moreno and other unsuspecting tenants against both the lawful Board and Mr. Rome. She has also falsely stated, repeatedly, that Mr. Rome's fee was not authorized in this case.

30. **In summary, all of Mr. Rome's fees have been disclosed in writing, discussed, and approved by a majority of the Board. The lawful TA is more than satisfied with his advice and representation.**

I declare that the foregoing is true and correct to the best of my knowledge and belief.

*William Glover*